Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles H. Linehan (SBN 307439)
  *clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
  *prajesh@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Hyungjoon Kim*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HYUNGJOON KIM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SYNOPSYS, INC., SASSINE GHAZI, and SHELAGH GLASER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Hyungjoon Kim ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Synopsys, Inc. ("Synopsys" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Synopsys; and (c) review of other publicly available information concerning Synopsys.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Synopsys securities between December 4, 2024 and September 9, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Synopsys provides electronic design automation software products used to design and test integrated circuits. It operates in two segments, Design Automation and Design IP.  The Design IP segment provides pre-designed, silicon-proven components that semiconductor companies use to build chips and System-on-Chips (SoCs) more quickly and cost-effectively. The Design IP segment includes a wide range of products and services, including Interface IP, which provides pre-designed modules for a variety of widely used protocols. The Company's Design IP segment has been the fastest-growing part of Synopsys, growing from 25% of the Company's revenue in fiscal year 2022, to 31% in fiscal year 2024.

3.      On September 9, 2025, after market hours, Synopsys released its third quarter 2025 financial results, revealing the Company's "IP business underperformed expectations." The Company reported quarterly revenue of $1.740 billion, missing its prior guidance of between $1.755 billion and $1.785 billion, and reported net income of $242.5 million, a 43% year-over-year decline from $425.9 million reported for third quarter 2024. Moreover, the Company reported its Design IP segment accounted for approximately 25% of revenue and came in at $426.6 million, a 7.7% decline

year-over-year. Finally, management provided guidance which implied that Design IP revenues will decline by at least 5% on a full-year basis in fiscal 2025.

4.    On this news, Synopsys's stock price fell $216.59, or 35.8%, to close at $387.78 per share on September 10, 2025, on unusually heavy trading volume.

5.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the extent to which the Company's increased focus on artificial intelligence customers, which require additional customization, was deteriorating the economics of its Design IP business; (2) that, as a result, "certain road map and resource decisions" were unlikely to "yield their intended results;" (3) that the foregoing had a material negative impact on financial results; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

11.     Plaintiff Hyungjoon Kim, as set forth in the accompanying certification, incorporated by reference herein, purchased Synopsys securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Synopsys is incorporated under the laws of Delaware with its principal executive offices located in Sunnyvale, California. Synopsys's common stock trades on the NASDAQ exchange under the symbol "SNPS."

13.     Defendant Sassine Ghazi ("Ghazi") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Shelagh Glaser ("Glaser") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.     Defendants Ghazi and Glaser (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

1

## SUBSTANTIVE ALLEGATIONS

2

### Background

3          16.     Synopsys provides electronic design automation software products used to design

4    and test integrated circuits. It operates in two segments, Design Automation and Design IP.  The

5    Design IP segment provides pre-designed, silicon-proven components that semiconductor

6    companies use to build chips and System-on-Chips (SoCs) more quickly and cost-effectively. The

7    Design IP segment includes a wide range of products and services, including Interface IP, which

8    provides pre-designed modules for a variety of widely used protocols. The Company's Design IP

9    segment has been the fastest-growing part of Synopsys, growing from 25% of the Company's

10   revenue in fiscal year 2022, to 31% in fiscal year 2024.

11                        ### Materially False and Misleading

12                ### Statements Issued During the Class Period

13          17.     The Class Period begins on December 4, 2024.[1] On that day, Synopsys issued a press

14   release announcing the financial results of its fourth fiscal quarter and fiscal year ended October 31,

15   2024. The press release also provided the Company's full fiscal year 2025 financial targets,

16   expecting revenue between $6.745 billion and $6.805 billion and EPS between $10.42 and $10.63.

17   The press release stated, in relevant part:

18          • Record quarterly revenue of $1.636 billion, up approximately 11% year over year
            (YoY), exceeding the mid-point of guidance.

19
20          • Quarterly GAAP earnings per diluted share (EPS) of $1.79; non-GAAP EPS of
            $3.40, up approximately 13% YoY, exceeding guidance.

21          • Achieved record full-year 2024 revenue of $6.127 billion, up approximately 15%
22          YoY, while improving non-GAAP operating margin and delivering approximately
            25% non-GAAP EPS growth.

23          • Expecting to deliver double digit revenue growth in 2025 while preparing for Ansys
            acquisition close, which remains on-track for the first half of 2025.

24                          *                    *                    *

25

26

27

─────────────────────────
28   [1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

| | Three Months Ended October 31, 2024 | | Three Months Ended October 31, 2023 | | Twelve Months Ended October 31, 2024 | | Twelve Months Ended October 31, 2023 | |
|---|---|---|---|---|---|---|---|---|
| **Revenue by segment** | | | | | | | | |
| - Design Automation | $ | 1,118.2 | $ | 953.7 | $ | 4,221.1 | $ | 3,775.3 |
| % of Total | | 68.3% | | 65.0% | | 68.9% | | 71.0% |
| - Design IP | $ | 517.8 | $ | 513.7 | $ | 1,906.3 | $ | 1,542.7 |
| % of Total | | 31.7% | | 35.0% | | 31.1% | | 29.0% |
| **Adjusted operating income by segment** | | | | | | | | |
| - Design Automation | $ | 413.3 | $ | 311.1 | $ | 1,631.9 | $ | 1,413.9 |
| - Design IP | $ | 189.9 | $ | 236.4 | $ | 730.2 | $ | 514.1 |
| **Adjusted operating margin by segment** | | | | | | | | |
| - Design Automation | | 37.0% | | 32.6% | | 38.7% | | 37.5% |
| - Design IP | | 36.7% | | 46.0% | | 38.3% | | 33.3% |

18.     On December 19, 2024, the Company submitted its annual report for the fiscal year ended October 31, 2024 on a Form 10-K filed with the SEC (the "FY24 10-K"). The FY24 10-K affirmed the previously reported financial results. The FY24 10-K further reported the Company's purported growth strategy and the factors impacting the Company's Design IP segment revenue. Specifically, the FY24 10-K stated as follows, in relevant part:

**Design IP Segment**

• Design IP includes our interface, foundation, security, and embedded processor IP, IP subsystems, and IP implementation services. These arrangements generally have two performance obligations which consist of transferring of the licensed IP and providing related support, which includes rights to technical support and software updates that are provided over the support term and are transferred to the customer over time. Revenue allocated to the IP licenses is recognized at a point in time upon the later of the delivery date or the beginning of the license period, and revenue allocated to support is recognized over the support term. Royalties are recognized as revenue in the quarter in which the applicable customer sells its products that incorporate our IP. Payments for IP contracts are generally received upon delivery of the IP. Revenue related to the customization of certain IP is recognized over time, generally using costs incurred or hours expended to measure progress.

                    *                    *                    *

| | Year Ended October 31, | | | $ Change | % Change | $ Change | % Change |
|---|---|---|---|---|---|---|---|
| | **2024** | **2023** | **2022** | **2024 vs. 2023** | | **2023 vs. 2022** | |
| | (dollars in millions) | | | | | | |
| Design Automation | $ 4,221.1 | $ 3,775.3 | $ 3,300.2 | $ 445.8 | 12 % | $ 475.1 | 14 % |
| Design IP | 1,906.3 | 1,542.7 | 1,315.5 | 363.6 | 24 % | 227.2 | 17 % |
| Total | $ 6,127.4 | $ 5,318.0 | $ 4,615.7 | $ 809.4 | 15 % | $ 702.3 | 15 % |

***Our revenues are subject to fluctuations, primarily due to customer requirements including the timing and value of contract renewals.*** For example, we experience fluctuations in our revenues due to factors such as the timing of IP product sales, Flexible Spending Account (FSA) drawdowns, royalties, and hardware products sales. As revenues from IP products sales and hardware products sales are recognized

upfront, customer demand and timing requirements for such IP products and hardware products could result in increased variability of our total revenues.

19. The FY24 10-K further purported to warn that the AI initiatives "could" impact the Company, stating in relevant part:

> **We may not be successful in our AI initiatives, which could adversely affect our business, operating results or financial condition.**
>
> We have incorporated, and are continuing to develop and deploy, AI into our products and the operations of our business. While these AI initiatives can present significant benefits, the AI landscape is rapidly evolving and may create risks and challenges for our business. If we fail to develop and timely offer products with AI features, if such products fail to meet our customers' demands, if these products fail to operate as expected, or if our competitors incorporate AI into their products more quickly or more successfully than we do, we may experience brand or reputational harm and lose our competitive position, our products may become obsolete, and our business, operating results or financial condition could be adversely affected.

20. The FY24 10-K further purported to warn that Synopsys' operating results "may" be affected by changes in the mix of products sold, stating in relevant part:

> **Our operating results may fluctuate in the future, which may adversely affect our stock price.**
>
> Our operating results are subject to quarterly and annual fluctuations, which may adversely affect our stock price. Our historical results should not be viewed as indicative of our future performance due to these periodic fluctuations.
>
> Many factors have in the past and may in the future cause our backlog, revenue or earnings to fluctuate, including, among other things:
>
> *                    *                    *
>
> **•Changes in the mix of our products sold, as increased sales of our products with lower gross margins, such as our hardware products, may reduce our overall margins**

21. On February 26, 2025, Synopsys issued a press release announcing the financial results of its first fiscal quarter ended January 31, 2025. The press release touted the Company's financial results and announced the Company's full fiscal year 2025 financial targets, as follows in relevant part:

> Results Summary
>
> • Quarterly revenue of $1.455 billion, exceeding midpoint of guidance.
>
> • Quarterly GAAP earnings per diluted share of $1.89; non-GAAP earnings per diluted share of $3.03, exceeding guidance.

• Reaffirming full-year 2025 guidance.

\*                    \*                    \*

| | Three Months Ended January 31, 2025 | | Three Months Ended January 31, 2024 | |
|---|---|---|---|---|
| Revenue by segment | | | | |
| - Design Automation | $ | 1,020.2 | $ | 985.3 |
| *% of Total* | | 70.1% | | 65.2% |
| - Design IP | $ | 435.1 | $ | 525.7 |
| *% of Total* | | 29.9% | | 34.8% |
| Adjusted operating income by segment | | | | |
| - Design Automation | $ | 404.7 | $ | 359.5 |
| - Design IP | $ | 126.5 | $ | 245.7 |
| Adjusted operating margin by segment | | | | |
| - Design Automation | | 39.7% | | 36.5% |
| - Design IP | | 29.1% | | 46.7% |

22.    On February 26, 2025, the Company submitted its quarterly report for the period ended January 31, 2025 on a Form 10-Q filed with the SEC (the "1Q25 10-Q"). The 1Q25 10-Q affirmed the previously reported financial results. The 1Q25 10-Q further purported to warn that the Company's AI initiatives "could" adversely affect the business, stating in relevant part:

> **We may not be successful in our AI initiatives, which could adversely affect our business, operating results or financial condition.**
>
> We have incorporated, and are continuing to develop and deploy, AI into our products and the operations of our business. While these AI initiatives can present significant benefits, the AI landscape is rapidly evolving and may create risks and challenges for our business. If we fail to develop and timely offer products with AI features, if such products fail to meet our customers' demands, if these products fail to operate as expected, or if our competitors incorporate AI into their products more quickly or more successfully than we do, we may experience brand or reputational harm and lose our competitive position, our products may become obsolete, and our business, operating results or financial condition could be adversely affected.

23.    The 1Q25 10-Q further purported to warn that Synopsys' operating results "may" be affected by changes in the mix of products sold, stating in relevant part:

> **Our operating results may fluctuate in the future, which may adversely affect our stock price.**
>
> Our operating results are subject to quarterly and annual fluctuations, which may adversely affect our stock price. Our historical results should not be viewed as indicative of our future performance due to these periodic fluctuations.
>
> Many factors have in the past and may in the future cause our backlog, revenue or earnings to fluctuate, including, among other things:
>
> \*                    \*                    \*
>
> **•Changes in the mix of our products sold, as increased sales of our products with lower gross margins, such as our hardware products, may reduce our overall margins**

24.     On May 28, 2025, Synopsys issued a press release announcing the financial results of its second fiscal quarter ended April 30, 2025. The press release touted the Company's financial results and announced the Company's full fiscal year 2025 financial targets, as follows in relevant part:

<u>Results Summary</u>

• Quarterly revenue of $1.604 billion, exceeding midpoint of guidance.

• Quarterly GAAP earnings per diluted share of $2.24; non-GAAP earnings per diluted share of $3.67, exceeding guidance.

• Reaffirming full-year 2025 revenue guidance, and non-GAAP operating margin guidance.

*      *      *

| | Three Months Ended April 30, 2025 | | Three Months Ended April 30, 2024 | | Six Months Ended April 30, 2025 | | Six Months Ended April 30, 2024 | |
|---|---|---|---|---|---|---|---|---|
| **Revenue by segment** | | | | | | | | |
| - Design Automation | $ | 1,122.3 | $ | 1,054.9 | $ | 2,142.5 | $ | 2,040.3 |
| *% of Total* | | *70.0%* | | *72.5%* | | *70.0%* | | *68.8%* |
| - Design IP | $ | 482.0 | $ | 399.8 | $ | 917.1 | $ | 925.4 |
| *% of Total* | | *30.0%* | | *27.5%* | | *30.0%* | | *31.2%* |
| **Adjusted operating income by segment** | | | | | | | | |
| - Design Automation | $ | 458.8 | $ | 418.2 | $ | 863.4 | $ | 777.7 |
| - Design IP | $ | 150.5 | $ | 124.8 | $ | 277.1 | $ | 370.5 |
| **Adjusted operating margin by segment** | | | | | | | | |
| - Design Automation | | 40.9% | | 39.6% | | 40.3% | | 38.1% |
| - Design IP | | 31.2% | | 31.2% | | 30.2% | | 40.0% |

25.     On May 28, 2025, the Company submitted its quarterly report for the period ended April 30, 2025 on a Form 10-Q filed with the SEC (the "2Q25 10-Q"). The 2Q25 10-Q affirmed the previously reported financial results. The 2Q25 10-Q further purported to warn that the Company's AI initiatives "could" adversely affect the business, stating in relevant part:

> ***We may not be successful in our AI initiatives, which could adversely affect our business, operating results or financial condition.***
>
> We have incorporated, and are continuing to develop and deploy, AI into our products and the operations of our business. While these AI initiatives can present significant benefits, the AI landscape is rapidly evolving and may create risks and challenges for our business. If we fail to develop and timely offer products with AI features, if such products fail to meet our customers' demands, if these products fail to operate as expected, or if our competitors incorporate AI into their products more quickly or more successfully than we do, we may experience brand or reputational harm and lose our competitive position, our products may become obsolete, and our business, operating results or financial condition could be adversely affected.

26.    The 1Q25 10-Q further purported to warn that Synopsys' operating results "may" be affected by changes in the mix of products sold, stating in relevant part

***Our operating results may fluctuate in the future, which may adversely affect our stock price.***

Our operating results are subject to quarterly and annual fluctuations, which may adversely affect our stock price. Our historical results should not be viewed as indicative of our future performance due to these periodic fluctuations.

Many factors have in the past and may in the future cause our backlog, revenue or earnings to fluctuate, including, among other things:

&ast;                        &ast;                        &ast;

•***Changes in the mix of our products sold, as increased sales of our products with lower gross margins, such as our hardware products, may reduce our overall margins***

27.    The above statements identified in ¶¶17-26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors: (1) the extent to which the Company's increased focus on artificial intelligence customers, which require additional customization, was deteriorating the economics of its Design IP business; (2) that, as a result, "certain road map and resource decisions" were unlikely to "yield their intended results;" (3) that the foregoing had a material negative impact on financial results; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## Disclosures at the End of the Class Period

28.    On September 9, 2025, after market hours, Synopsys released its third quarter 2025 financial results, revealing the Company's "IP business underperformed expectations." The Company reported quarterly revenue of $1.740 billion, missing its prior guidance of between $1.755 billion and $1.785 billion, and reported net income of $242.5 million, a 43% year-over-year decline from $425.9 million reported for third quarter 2024. Moreover, the Company reported its Design IP segment, which accounts for approximately 25% of revenue, came in at $426.6 million, a 7.7% decline year-over-year. Specifically, the press release stated as follows, in relevant part:

**Synopsys Posts Financial Results for Third Quarter Fiscal Year 2025**

Results Summary

• Quarterly revenue of $1.740 billion, up 14% year-over-year (YoY)

• Quarterly GAAP earnings per diluted share of $1.50; non-GAAP earnings per diluted share of $3.39

• Results reflect the closing of Ansys acquisition on July 17, 2025

• Expecting full-year 2025 revenue between $7.03 and $7.06 billion dollars as Synopsys transformation continues

SUNNYVALE, Calif. – Sep. 9, 2025 – Synopsys, Inc. (Nasdaq: SNPS) today reported results for its third quarter of fiscal year 2025. Revenue for the third quarter of fiscal year 2025 was $1.740 billion, compared to $1.526 billion for the third quarter of fiscal year 2024.

"Q3 was a transformational quarter. Against a challenging geo-political backdrop, we closed the Ansys acquisition – expanding our portfolio, customer base and opportunity. Now more than ever, Synopsys is the mission-critical partner technology R&D needs to design and deliver AI-powered products," said Sassine Ghazi, president and CEO of Synopsys. "While I'm proud of how our team navigated external challenges in the quarter, *our IP business underperformed expectations.* We are taking action to enhance our competitive advantage and drive resilient, long-term growth."

"*In Q3, strength in Design Automation was offset by weakness in Design IP*," said Shelagh Glaser, CFO of Synopsys. "We are taking a more conservative view of Q4, while guiding another consecutive year of profitable growth."

**GAAP Results**

On a U.S. generally accepted accounting principles (GAAP) basis, net income for the third quarter of fiscal year 2025 was $242.5 million, or $1.50 per diluted share, compared to $425.9 million, or $2.73 per diluted share, for the third quarter of fiscal year 2024.

29.    The same press release also reported financial results by segment. For third quarter 2025 in the Design IP segment, Synopsys $427.6 million revenue (24.6% of total revenue), down from $463.1 million in third quarter 2024 (30.4% of total revenue), and adjusted operating income of $86 million, down from $169.7 million in third quarter 2024.

30.    The same day, Synopsys provided guidance for fourth quarter and full year 2025. In a press release, Synopsys expected full year revenue between $7.030 and $7.060 billion, which implied that Design IP revenues will decline by at least 5% on a full-year basis.

31.    In an earnings call held the same day (the "3Q25 Earnings Call"), defendant Ghazi revealed "results were primarily impacted by underperformance in the IP business" driven by factors

including "*certain road map and resource decisions that did not yield their intended results.*" As a result, the Company is "actively pivoting [its] IP resources and road map" and the Company is "taking a more cautious view of Q4." Specifically, defendant Ghazi stated as follows, in relevant part:

> Good afternoon. Q3 was a transformational milestone quarter for Synopsys. Against an unprecedented and challenging geopolitical backdrop, we closed the Ansys acquisition, expanding our revenue, our customer base and our long-term opportunity. We delivered third quarter revenue of $1.74 billion and non-GAAP EPS of $3.39.
>
> **Our results were primarily impacted by underperformance in the IP business as we had the expectation of deals that did not materialize, driven largely by the following 3 factors: one, new export restrictions disrupted design starts in China, compounding China weakness; two, challenges at a major foundry customer are also having a sizable impact on the year. And finally, we made certain road map and resource decisions that did not yield their intended results.**
>
> **We are actively pivoting our IP resources and road map towards the highest growth opportunities,** which I'll discuss in more detail. Looking ahead, we believe we have derisked our forecast, knowing that transformation takes time and the external headwinds I cited will continue. **We are taking a more cautious view of Q4** while still expecting to deliver a record revenue year. Let me provide more color on our Q3 execution and the actions we're taking to accelerate our strategy before Shelagh covers the financials in more detail.

32.     During the same call, defendant Ghazi explained the pivot in Design IP as: "there's more and more customization in particular, for interface IP, and these customizations are moving from an off-the-shelf to a more subsystem delivery which is it takes longer, it takes more resources." He concluded that, as a result "*our ability to change the business model or the need to change the business model is an ongoing dialogue with our customers*." Specifically, defendant Ghazi stated as follows, in relevant part:

> So today, if you look at the Synopsys portfolio for IP, we serve multiple markets, HPC, Edge AI, automotive, mobile, consumer, and we serve that portfolio for multiple foundries, not only one foundry. And as I mentioned to Ruben when he asked the question, we have and our customer has expectations, and we have the responsibility given that portfolio breadth that we have to serve the multiple foundries for those multiple markets in both interface IP and foundation IP. And there's more and more customization in particular, for interface IP.
>
> **And these customization are moving from an off-the-shelf to a more subsystem delivery which is it takes longer, it takes more resources and our ability to change the business model or the need to change the business model is an ongoing dialogue with our customers because as they're expecting us to do more work than just off-the-shelf IP,** there's an opportunity for higher monetization. And that's what

we're pivoting our resources, our methodology, our approach from an architecture point of view to serve that market for the interface IP that I talked about.

33.     However, defendant Ghazi also admitted that "the pivot from our customers in terms of expectation from off-the-shelf IP to customization is not new. But what is new is the magnitude in which the number of customers are expecting for us to deliver [customization]" and "[g]iven the demand for that customization, we need to ensure that we are capturing the right value for the impact we're delivering." He concluded "we are absolutely assessing as this market is pivoting, and we're pivoting with it, *what is the business model to maintain the right profitability in order to capture the opportunity and growth that we have.*" Specifically, he stated as follows, in relevant part:

> *The pivot from our customers in terms of expectation from off-the-shelf IP to customization is not new. But what is new is the magnitude in which the number of customers are expecting for us to deliver* instead of discrete IP to deliver a number of IP that we glue them together with some customization logic and test logic, et cetera, and validate and ensure that it hits the mark with the right quality. Each one of those engagements historically had 2 components. It had an NRE component and a use fee component.

> *Given the demand for that customization, we need to ensure that we are capturing the right value for the impact we're delivering.* Therefore, it's not something that we are, I want to say, happy to just say it's an NRE plus a use fee, there has to be another element in order for us to put priority for these opportunities and deliver to. And that's what the discussions we're having with a number of these customers. And as you look ahead, if you fast forward 2-plus years from now, will we start delivering from an discrete IP to a subsystem to possibly chiplet? What level of chiplet? Is it a soft chiplet? Is it a hardened chiplet, meaning GDS2? Is it all the way down to a known good die with a partner?

> These are all questions and expectations our customers are asking us, given we are the leader in that space, and we have a number of engagements with a few strategic partners. *We are absolutely assessing as this market is pivoting, and we're pivoting with it, what is the business model to maintain the right profitability in order to capture the opportunity and growth that we have.*

34.     On this news, Synopsys's stock price fell $216.59, or 35.8%, to close at $387.78 per share on September 10, 2025, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Synopsys securities between December 4, 2024 and September 9, 2025, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants,

the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

36.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Synopsys's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Synopsys shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Synopsys or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

37.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

38.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

39.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Synopsys; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

40.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

41.     The market for Synopsys's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Synopsys's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Synopsys's securities relying upon the integrity of the market price of the Company's securities and market information relating to Synopsys, and have been damaged thereby.

42.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Synopsys's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Synopsys's business, operations, and prospects as alleged herein.

43.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Synopsys's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the

1  Class purchasing the Company's securities at artificially inflated prices, thus causing the damages

2  complained of herein when the truth was revealed.

3  **LOSS CAUSATION**

4  44.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

5  the economic loss suffered by Plaintiff and the Class.

6  45.    During the Class Period, Plaintiff and the Class purchased Synopsys's securities at

7  artificially inflated prices and were damaged thereby.  The price of the Company's securities

8  significantly declined when the misrepresentations made to the market, and/or the information

9  alleged herein to have been concealed from the market, and/or the effects thereof, were revealed,

10  causing investors' losses.

11  **SCIENTER ALLEGATIONS**

12  46.    As alleged herein, Defendants acted with scienter since Defendants knew that the

13  public documents and statements issued or disseminated in the name of the Company were

14  materially false and/or misleading; knew that such statements or documents would be issued or

15  disseminated to the investing public; and knowingly and substantially participated or acquiesced in

16  the issuance or dissemination of such statements or documents as primary violations of the federal

17  securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their

18  receipt of information reflecting the true facts regarding Synopsys, their control over, and/or receipt

19  and/or modification of Synopsys's allegedly materially misleading misstatements and/or their

20  associations with the Company which made them privy to confidential proprietary information

21  concerning Synopsys, participated in the fraudulent scheme alleged herein.

22  **APPLICABILITY OF PRESUMPTION OF RELIANCE**

23  **(FRAUD-ON-THE-MARKET DOCTRINE)**

24  47.    The market for Synopsys's securities was open, well-developed and efficient at all

25  relevant times.  As a result of the materially false and/or misleading statements and/or failures to

26  disclose, Synopsys's securities traded at artificially inflated prices during the Class Period.  On July

27  30, 2025, the Company's share price closed at a Class Period high of $645.35 per share.  Plaintiff

28  and other members of the Class purchased or otherwise acquired the Company's securities relying

1  upon the integrity of the market price of Synopsys's securities and market information relating to

2  Synopsys, and have been damaged thereby.

3      48.    During the Class Period, the artificial inflation of Synopsys's shares was caused by

4  the material misrepresentations and/or omissions particularized in this Complaint causing the

5  damages sustained by Plaintiff and other members of the Class.  As described herein, during the

6  Class Period, Defendants made or caused to be made a series of materially false and/or misleading

7  statements about Synopsys's business, prospects, and operations.  These material misstatements

8  and/or omissions created an unrealistically positive assessment of Synopsys and its business,

9  operations, and prospects, thus causing the price of the Company's securities to be artificially

10  inflated at all relevant times, and when disclosed, negatively affected the value of the Company

11  shares.  Defendants' materially false and/or misleading statements during the Class Period resulted

12  in Plaintiff and other members of the Class purchasing the Company's securities at such artificially

13  inflated prices, and each of them has been damaged as a result.

14      49.    At all relevant times, the market for Synopsys's securities was an efficient market

15  for the following reasons, among others:

16      (a)    Synopsys shares met the requirements for listing, and was listed and actively

17  traded on the NASDAQ, a highly efficient and automated market;

18      (b)    As a regulated issuer, Synopsys filed periodic public reports with the SEC

19  and/or the NASDAQ;

20      (c)    Synopsys regularly communicated with public investors via established

21  market communication mechanisms, including through regular dissemination of press releases on

22  the national circuits of major newswire services and through other wide-ranging public disclosures,

23  such as communications with the financial press and other similar reporting services; and/or

24      (d)    Synopsys was followed by securities analysts employed by brokerage firms

25  who wrote reports about the Company, and these reports were distributed to the sales force and

26  certain customers of their respective brokerage firms.  Each of these reports was publicly available

27  and entered the public marketplace.

28

50.    As a result of the foregoing, the market for Synopsys's securities promptly digested current information regarding Synopsys from all publicly available sources and reflected such information in Synopsys's share price. Under these circumstances, all purchasers of Synopsys's securities during the Class Period suffered similar injury through their purchase of Synopsys's securities at artificially inflated prices and a presumption of reliance applies.

51.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement

1  was authorized or approved by an executive officer of Synopsys who knew that the statement was

2  false when made.

3                              **FIRST CLAIM**

4               **Violation of Section 10(b) of The Exchange Act and**

5                  **Rule 10b-5 Promulgated Thereunder**

6                         **Against All Defendants**

7        53.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

8  set forth herein.

9        54.    During the Class Period, Defendants carried out a plan, scheme and course of conduct

10  which was intended to and, throughout the Class Period, did: (i) deceive the investing public,

11  including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other

12  members of the Class to purchase Synopsys's securities at artificially inflated prices.  In furtherance

13  of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the

14  actions set forth herein.

15        55.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

16  statements of material fact and/or omitted to state material facts necessary to make the statements

17  not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a

18  fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially

19  high market prices for Synopsys's securities in violation of Section 10(b) of the Exchange Act and

20  Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal

21  conduct charged herein or as controlling persons as alleged below.

22        56.    Defendants, individually and in concert, directly and indirectly, by the use, means or

23  instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

24  continuous course of conduct to conceal adverse material information about Synopsys's financial

25  well-being and prospects, as specified herein.

26        57.    Defendants employed devices, schemes and artifices to defraud, while in possession

27  of material adverse non-public information and engaged in acts, practices, and a course of conduct

28  as alleged herein in an effort to assure investors of Synopsys's value and performance and continued

1  substantial growth, which included the making of, or the participation in the making of, untrue

2  statements of material facts and/or omitting to state material facts necessary in order to make the

3  statements made about Synopsys and its business operations and future prospects in light of the

4  circumstances under which they were made, not misleading, as set forth more particularly herein,

5  and engaged in transactions, practices and a course of business which operated as a fraud and deceit

6  upon the purchasers of the Company's securities during the Class Period.

7     58.    Each of the Individual Defendants' primary liability and controlling person liability

8  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

9  directors at the Company during the Class Period and members of the Company's management team

10  or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities

11  as a senior officer and/or director of the Company, was privy to and participated in the creation,

12  development and reporting of the Company's internal budgets, plans, projections and/or reports;

13  (iii) each of these defendants enjoyed significant personal contact and familiarity with the other

14  defendants and was advised of, and had access to, other members of the Company's management

15  team, internal reports and other data and information about the Company's finances, operations, and

16  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

17  dissemination of information to the investing public which they knew and/or recklessly disregarded

18  was materially false and misleading.

19     59.    Defendants had actual knowledge of the misrepresentations and/or omissions of

20  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

21  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

22  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

23  and effect of concealing Synopsys's financial well-being and prospects from the investing public

24  and supporting the artificially inflated price of its securities. As demonstrated by Defendants'

25  overstatements and/or misstatements of the Company's business, operations, financial well-being,

26  and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the

27  misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

28

1 deliberately refraining from taking those steps necessary to discover whether those statements were

2 false or misleading.

3      60.    As a result of the dissemination of the materially false and/or misleading information

4 and/or failure to disclose material facts, as set forth above, the market price of Synopsys's securities

5 was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the

6 Company's securities were artificially inflated, and relying directly or indirectly on the false and

7 misleading statements made by Defendants, or upon the integrity of the market in which the

8 securities trades, and/or in the absence of material adverse information that was known to or

9 recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during

10 the Class Period, Plaintiff and the other members of the Class acquired Synopsys's securities during

11 the Class Period at artificially high prices and were damaged thereby.

12      61.    At the time of said misrepresentations and/or omissions, Plaintiff and other members

13 of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other

14 members of the Class and the marketplace known the truth regarding the problems that Synopsys

15 was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class

16 would not have purchased or otherwise acquired their Synopsys securities, or, if they had acquired

17 such securities during the Class Period, they would not have done so at the artificially inflated prices

18 which they paid.

19      62.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

20 and Rule 10b-5 promulgated thereunder.

21      63.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

22 other members of the Class suffered damages in connection with their respective purchases and

23 sales of the Company's securities during the Class Period.

24                              **SECOND CLAIM**

25              **Violation of Section 20(a) of The Exchange Act**

26              **Against the Individual Defendants**

27      64.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

28 set forth herein.

65.    Individual Defendants acted as controlling persons of Synopsys within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.    As set forth above, Synopsys and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

1        (c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

2  action, including counsel fees and expert fees; and

3        (d)      Such other and further relief as the Court may deem just and proper.

4                              **JURY TRIAL DEMANDED**

5      Plaintiff hereby demands a trial by jury.

6  DATED:  October 31, 2025          **GLANCY PRONGAY & MURRAY LLP**

7                              By:   *Pavithra Rajesh*
                                    _____

8                              Robert V. Prongay
                              Charles H. Linehan

9                              Pavithra Rajesh
                              1925 Century Park East, Suite 2100

10                              Los Angeles, California 90067
                              Telephone:  (310) 201-9150

11                              Facsimile:  (310) 201-9160
                              Email: clinehan@glancylaw.com

12                                          prajesh@glancylaw.com

13                              **LAW OFFICES OF HOWARD G. SMITH**

14                              Howard G. Smith
                              3070 Bristol Pike, Suite 112

15                              Bensalem PA 19020
                              Telephone: (215) 638-4847

16                              Facsimile: (215) 638-4867

17

18                              *Counsel for Plaintiff Hyungjoon Kim*

19

20

21

22

23

24

25

26

27

28

## SWORN CERTIFICATION OF PLAINTIFF

Synopsys, Inc., SECURITIES LITIGATION

I,       Hyungjoon Kim             , certify:

1. I have reviewed the Complaint, adopt its allegations, and authorize its filing and/or the filing of a lead plaintiff motion on my behalf.

2. I did not purchase Synopsys, Inc., the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Synopsys, Inc., during the class period set forth in the Complaint are as follows:

5. I have not sought to serve, nor served, as a representative party on behalf of a class in any action under the federal securities laws (15 U.S. Code, Chapter 2B; and 15 U.S. Code, Chapter 2A, Subchapter I) during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated:    10/29/2025                       *Hyungjoon Kim*

DocuSigned by:
FB9FD3E8109A428...

Hyungjoon Kim

**Hyungjoon Kim's Transactions in Synopsys, Inc. (SNPS)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 9/8/2025 | Bought | 37 | $610.22 |